**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FATIMAH TOTTEN,

                **Plaintiff,**

      **v.**

BENEDICTINE UNIVERSITY,

                **Defendant.**

**Case No. 20 C 6107**

**Judge Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

Defendant Benedictine University moves to dismiss Plaintiff Fatimah Totten's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 19.) For the reasons stated herein, the motion is denied as to Counts I, III, and IV. The motion is granted as to Counts II, V, and VI. Count V is dismissed with prejudice. Counts II and VI are dismissed without prejudice. Totten may file a second amended complaint within 30 days of the entry of this opinion and order. Failure to do so will convert the order on Counts II and VI to one with prejudice.

### I.  BACKGROUND

Plaintiff Fatimah Totten alleges that she is a mixed-race, half-black and half-white, Muslim female. (Am. Compl. ¶ 1, Dkt. No. 16.) In the fall of 2016, Totten matriculated as a student at Defendant Benedictine University to pursue a bachelor's degree in business administration. (*Id.* ¶ 14.) Totten now brings this action

against her former university alleging violations of Title IX (Counts I and II) and Title VI (Count III and IV), as well as state law claims for negligent infliction of emotional distress (Count V) and intentional infliction of emotional distress (Count VI). The claims arise out of Benedictine's response to Totten's reports that she was a victim of sexual assault by a fellow student and a victim of harassment by her former roommate.

### A. Sexual Assault by the Assailant

Totten first met the student who would be her future assailant, "Assailant," in September 2016. (*Id.* ¶ 16.) Totten and Assailant were both pursuing degrees in business administration at Benedictine. (*Id.* ¶ 39.) According to the amended complaint, in approximately March 2018, Benedictine's administration launched a Title IX investigation into allegations of sexual harassment and/or sexual misconduct against the Assailant. (*Id.* ¶ 17.) That same spring, two additional female students reported sexual misconduct by Assailant to Benedictine faculty members. (*Id.* ¶ 18.) The amended complaint does not allege any details on the outcome of the spring 2018 Title IX investigation or whether the faculty members reported the allegations to Benedictine administration. Despite these allegations, Benedictine permitted the Assailant to remain on campus, attend classes, and attend university-sponsored events. (*Id.* ¶ 19.)

- 2 -

On August 18, 2018, Assailant sexually assaulted Totten at his home in Chicago. (*Id.* ¶ 20.) One week later, Totten moved into her randomly assigned apartment in Becker Hall, a residence hall on Benedictine's campus. (*Id.* ¶ 21.) Assailant's randomly assigned apartment was also in Becker Hall and located directly below Totten's apartment. (*Id.*) That fall, Assailant sexually assaulted Totten twice more, on October 14 and 21, 2018, both times in her Becker Hall apartment. (*Id.* ¶¶ 22–23.)

On December 2, 2018 Assailant forced himself into Totten's Becker Hall apartment and threw her against the wall. (*Id.* ¶ 24.) Bystanders called the Benedictine University Police Department ("BUPD") who arrived on scene and escorted Assailant back to his apartment. (*Id.*) The same night, Totten reported the August and October sexual assaults to the BUPD (*Id.* ¶ 25.) Following this report, the BUPD advised Totten not to contact or communicate with Assailant and to call the police if Assailant contacted her in any way. (*Id.*) BUPD also advised Assailant not to contact or communicate with Totten. (*Id.*)

In the days following the physical assault, Assailant sent text messages to Totten and her sister. (*Id.* ¶ 26.) Following the instructions from BUPD, Totten immediately reported these text messages to the police. (*Id.*) In response, BUPD took no action and told Totten to "stop with the high school bullsh*t." (*Id.*) Later,

when Totten followed up with BUPD on their investigation into the reported sexual assaults, BUPD suggested that if Totten was dissatisfied with their handling of her case, she should contact the Village of Lisle Police Department ("LPD"). (*Id.*) Totten then reported the assaults to LPD. (*Id.*)

Following the December 2 incident, Assailant continued to live in an apartment in Becker Hall. (*Id.* ¶ 27.) Totten also continued to regularly see Assailant on campus, at minimum in the shared business courses they were taking during the fall 2018 semester. (*Id.* ¶ 39.) Fearing for her safety, on December 6, 2018 Totten obtained an emergency order of protection against the Assailant from the DuPage County Circuit Court. (*Id.* ¶ 28.) Totten alleges that Benedictine knew about the emergency order of protection. (*Id.*) Even with the BUPD no contact order and the DuPage County emergency order of protection in place, Assailant continued to harass Totten. (*Id.* ¶ 27.) Assailant's repeated contacts included, approaching Totten while she was on campus, calling her on the telephone, and playing inappropriate music in her apartment by connecting to her Bluetooth speaker (an action made possible because he continued to live in close proximity to Totten). (*Id.*)

On December 10, 2018, Totten filed a formal Title IX complaint against the Assailant. (*Id.* ¶ 29.) At this time, Benedictine

students were taking their final exams for the fall 2018 semester. (*Id.* ¶ 40.) Totten approached Benedictine to request an extension of her final exams or other reasonable accommodations in order to avoid further interactions with Assailant. (*Id.*) Totten continue to worry about her safety and merely asked to take her exams in an environment free from harassment or the potential for harassment. (*Id.*) Totten alleges that despite her requests, Benedictine failed to provide any reasonable accommodations. (*Id.*)

On January 17, 2019, Benedictine concluded its investigation and issued its Title IX Final Report in response to Totten's complaint. (*Id.* ¶ 31.) Benedictine's Title IX Report concluded, using a preponderance of evidence standard, that Assailant sexually assaulted Totten on all three reported occasions and in doing so violated Benedictine's Sexual Misconduct Policy. (*Id.*) The report went on to recommend that Assailant be banned from living on campus during the spring 2019 semester—his final semester at Benedictine. (*Id.*) Benedictine's Title IX Report did not recommend any additional disciplinary action. (*Id.*) Consequently, in the spring of 2019 Assailant was permitted to return to campus, take courses, attend social functions, and ultimately graduate from Benedictine. (*Id.*)

Around this same time, on January 24, 2019, DuPage County entered a plenary order of protection, effective until January 20,

- 5 -

2021. (*Id.* ¶ 28.) Under the terms of the plenary order of the Assailant was prohibited from: (1) committing further acts of harassment or abuse against Totten; (2) coming within 1000 feet of Totten and/or her residence at Benedictine; (3) contacting Totten directly or indirectly; and (4) entering or remaining at Totten's place of employment or her family home. (*Id.*)

### B. Harassment by Roommate

During the fall 2018 semester, Totten shared her Becker Hall apartment with "Roommate." (*Id.* ¶ 21.) According to the amended complaint, Roommate is of a different race and national origin than Totten. (*Id.*) On November 28, 2018, Totten reported to a Benedictine administrator that she had been the victim of harassment by Roommate. (*Id.* ¶ 32.) Specifically, Roommate threatened Totten with harm, stabbed the door to Totten's bedroom with a knife, and trashed their apartment. (*Id.*) The administrator counseled Totten to "try to get through it . . . because it was so close to the end of the semester, final exams were imminent and ongoing, and [Totten] would soon be moving out of her apartment because winter break was approaching." (*Id.*)

The next day, Roommate violently entered Totten's bedroom and threatened her repeatedly. (*Id.* ¶ 33.) Shortly thereafter, BUPD arrived at Totten's apartment to investigate the incident. (*Id.*) Totten reported Roommate's threats from that night, as well as her

prior threats during the course of the semester. (*Id.*) In response BUPD arrested Roommate. (*Id.*)

After the incident, Roommate was relocated to a different apartment on Benedictine's campus. (*Id.*) To facilitate Roommate's relocation, Benedictine arranged for Roommate to move her belongings while Totten was out of the apartment. (*Id.* ¶ 34.) During the move, however, Roommate was left unsupervised. (*Id.*) While packing her belongings, Roommate stole from Totten and damaged other pieces of Totten's personal property. (*Id.*) Totten reported the theft and destruction of property to Benedictine Dean Marco Masini, but no action was taken by Dean Masini or any other Benedictine official to recover the stolen goods or compensate Totten for the damaged property. (*Id.*)

On December 1, 2018, Totten reported to BUPD that Roommate was stalking her and had scratched Totten's car with a key. (*Id.* ¶ 36.) BUPD advised Totten that if she felt unsafe on campus, she could return to her family home. (*Id.*) To Totten's knowledge, BUPD did not take any action against Roommate. On or around that same day, Roommate called BUPD pretending to be Totten and reported that she was suicidal and needed to be hospitalized. (*Id.* ¶ 35.) BUPD then entered Totten's apartment, while she was sleeping, causing Totten to get out of bed in her underwear and without her hijab. (*Id.*) Totten was left deeply embarrassed by this incident.

(*Id.*) BUPD later admitted that they recognized the number as belonging to Roommate and knew Totten had not placed the call. (*Id.*) Roommate was never disciplined for this false report. (*Id.*)

Three weeks later, Roommate approached Totten while she was sitting in her car. (*Id.* ¶ 37.) Roommate banged her hands against Totten's vehicle and screamed that Totten was not welcome on campus. (*Id.*) Totten called BUPD, who arrived on the scene and first spoke with Roommate. (*Id.*) BUPD then informed Totten that Roommate had mistaken Totten's car for a friend's vehicle. (*Id.*) No disciplinary action was taken. (*Id.*)

On December 21, 2018, Benedictine concluded its investigation into Roommate's conduct over the course of the fall 2018 semester. (*Id.* ¶ 38.) Benedictine informed Totten that Roommate was no longer cooperating with the investigation. (*Id.*) As a result, there would be no meeting with Totten and Roommate to discuss the events and find a resolution. (*Id.*) The amended complaint alleges that during the course of and at the conclusion of their investigation, Benedictine took no disciplinary action to address or prevent Roommate's misconduct. (*Id.*)

### C. The Spring 2019 Semester

Going into the spring 2019 semester, Totten needed just five courses to complete her degree and graduate. (*Id.* ¶ 41.) The week of December 18, 2018 Totten met with Dean Masini to discuss the

spring semester. (*Id.*) During the meeting Totten explained that she feared for her safety while on campus and requested that she be permitted to take classes online during the upcoming semester. (*Id.* ¶¶ 41–42.) Dean Masini did not agree to allow Totten to take online classes during this December meeting. (*Id.* ¶ 42.)

Without assurances that Benedictine would ensure her safety, Totten did not register for classes for the spring 2019 semester. (*Id.* ¶ 45.) Totten followed up with Dean Masini in January 2019 regarding what accommodations would be provide by Benedictine, to ensure her safety from Assailant and Roommate. (*Id.* ¶ 43.) In response Dean Masini failed to offer any accommodations and instead only explained that Assailant and Roommate were both on track to graduate in May 2019. (*Id.*) When Benedictine's spring semester began on January 14, 2019, Totten was still not registered for any classes. (*Id.* ¶ 45.)

In February 2019, Totten informed Benedictine that she intended to take a temporary leave of absence. (*Id.*) In March, Totten decided to complete her degree at another college or university. (*Id.* ¶ 47.) Totten's transfer applications required a copy of her Benedictine transcript. (*Id.* ¶ 48.) Totten, however, was unable to obtain a copy of her transcript because Benedictine had placed a hold on her student account. (*Id.*) At the end of

March, Dean Masini proposed a meeting with Totten to discuss how she could obtain her transcript. (*Id.* ¶ 49.)

On March 26, 2019 Totten was on Benedictine's campus with friends. (*Id.* ¶ 50.) Roommate approached Totten, screaming at, and threatening her. (*Id.*) Totten left campus feeling scared. (*Id.*) That same evening, BUPD called Totten's home and informed her mother that Totten had been trespassing and was now banned from Benedictine property because of "girl drama." (*Id.*) During that call, BUPD also told Totten's mother that Totten had become the "talk of the town." (*Id.*)

On March 28, 2019, Totten and her mother met with Dean Masini. (*Id.* ¶ 52.) During the meeting Totten and her mother inquired into Benedictine's response to the findings of its Title IX investigation and Totten's reports of harassment by Roommate. (*Id.*) Specifically, the women wanted to discuss Benedictine's failure to offer Totten any accommodations to ensure her safety and failure to take disciplinary action against Assailant or Roommate. (*Id.*) Dean Masini first explained that he is the ultimate decision maker on disciplinary action. (*Id.*) He further explained that while Benedictine does not have a zero-tolerance policy for sexual misconduct, in some cases a single incident will result in the perpetrator's dismissal from the university. (*Id.*) Dean Masini went on to say that, in Totten's case, he concluded that dismissing

Assailant was not an appropriate remedy. (*Id.*) Dean Masini then explained that if Totten had been a "different kind of student" Benedictine may have handled the Title IX investigation and reports of harassment by Roommate differently. (*Id.*) During this meeting, Dean Masini failed to propose a pathway for Totten to obtain her transcript, so she could pursue her degree elsewhere. (*Id.*)

Following the meeting with Dean Masini, Benedictine continued to ignore Totten's requests for accommodations so she could complete her degree. (*Id.* ¶ 54.) Benedictine also continued to place a hold on Totten's account, preventing her from accessing a copy of her transcript. (*Id.*) From May to November 2019 collection agencies and attorneys contacted Totten on behalf of Benedictine demanding repayment for tuition and other educational expenses. (*Id.* ¶ 55.)

In September 2019, Totten decided to take classes at a community college. (*Id.* ¶ 56.) Totten worked with Benedictine administrators and faculty to select classes that would count toward her outstanding degree requirements. (*Id.*) In December 2019, Totten completed the community college coursework and submitted proof to Benedictine. (*Id.*) It was then that Benedictine administrators informed Totten that the courses would not count toward her degree and she would need to return to campus in the spring of 2020 to complete her degree. (*Id.*) Totten agreed and

registered for the necessary courses, earning her degree on May 31, 2020. (*Id.* ¶ 59.)

### D.  Procedural Posture

Totten filed her original complaint on October 14, 2020. (Dkt. No. 1.) On December 2, 2020, Benedictine filled a motion to dismiss. (Dkt. No. 12.) In response, Totten filed her amended complaint on December 21, 2020. (Dkt. 16.) On January 11, 2021, Benedictine filed this motion to dismiss the amended complaint. (Dkt. No. 19.)

## II.  <u>LEGAL STANDARD</u>

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher,* 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

At the motion to dismiss stage, the Court "accept[s] all well-pleaded facts in the complaint as true and then ask whether those facts state a plausible claim for relief. *Firestone Fin. Corp. v. Meyer,* 796 F.3d 822, 826 (7th Cir. 2015). All reasonable inferences are construed in favor of the Plaintiff. *Id.*

### III.  DISCUSSION

Totten alleges Benedictine's handling of her claims of sexual assault by Assailant and harassment by Roommate violated Title IX and Title VI. Totten also brings state law claims for negligent infliction of emotional distress and intentional infliction of emotional distress. The Court considers each claim below.

### A.  Title IX Discrimination Claims

Title IX of the Education Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Benedictine does not dispute that it receives federal financial assistance for its educational programs and is therefore subject to the prohibitions in Title IX.

Totten raises two Title IX claims. Count I alleges that Benedictine discriminated against Totten by displaying deliberate indifference to her claims of sexual assault by Assailant. Count II alleges that Benedictine retaliated against her for reporting her sexual assault. Benedictine moves to dismiss both counts. For the reasons explained below, Benedictine's motion is denied as to Count I and granted as to Count II.

### 1. *Deliberate Indifference (Count I)*

To establish a Title IX discrimination claim arising from student-on-student sexual assault or harassment, Totten must allege: (1) Benedictine exercised substantial control over both Assailant and the context in which the known harassment occurred; (2) she suffered harassment that is so severe, pervasive, and objectively offensive that it can be said to deprive them of access to the educational opportunities or benefits provided by the school; (3) Benedictine had actual knowledge of the harassment; (4) Benedictine acted with deliberate indifference to the harassment; and (5) Benedictine's deliberate indifference caused her to undergo harassment or made her vulnerable to it. *Pogorzelska v. VanderCook Coll. of Music,* 442 F.Supp.3d 1054, 1062 (N.D. Ill.

2020) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999)).

Liability for deliberate indifference does not punish the harassing conduct, but rather the "decision by the recipient [of federal funds] not to remedy the violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 276 (1998). "Deliberate indifference is a high standard and must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it. *Pogorzelska,* 442 F.Supp.3d at 1062 (quotation marks omitted). Totten alleges that Benedictine's deliberate indifference made her vulnerable to harassment in two ways. First, Benedictine received prior reports of sexual assault by Assailant, but failed to take action that would prevent further misconduct on campus. Second, after reporting her own sexual assault, Benedictine failed to take action to protect her from further harassment by Assailant. The Court addresses each in turn.

Totten first focuses on Benedictine's response to the spring 2018 reports of sexual misconduct by Assailant. Totten argues that Benedictine's failure to act in response to these claims evidences the school's deliberate indifference and rendered her vulnerable to further sexual assaults by Assailant, in October 2018. In response Benedictine argues that Totten's speculation that that the school took no action is insufficient to state a claim.

- 15 -

Benedictine may be liable under Title IX where it had actual knowledge of prior misconduct and allowed the danger to persist. *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.,* 551 F.3d 599, 606 (7th Cir. 2008). For example, if the Benedictine knew the Assailant to be a "serial harasser" the Court could conclude that it had knowledge of his misconduct and the university's inaction put other female students at risk. *Id.* But as alleged in the amended complaint, Benedictine did not have knowledge that the Assailant was a serial offender.

Totten alleges three reports of sexual misconduct by Assailant, in the spring of 2018. Two reports were made to Benedictine faculty and the third to the Benedictine Title IX Office. Under Benedictine's Title IX Policy, the alleged reports to faculty in spring 2018 do not establish that Benedictine had knowledge of the misconduct. To start, the amended complaint does not allege that the faculty members elevated the reports to the Title IX office or any administrators or law enforcement. Nor can the Court infer that this was done. Benedictine's Title IX policy states that only "Officials with Authority" are required "to report allegations of sexual harassment to the Title IX Coordinator." Title IX Policy at 5, *https://www.ben.edu/compliance/upload/NEW-TitleIX-Policy-FINAL-9152020.pdf* (last accessed 7/14/21). The policy defines "Official with Authority" as an "official of the

- 16 -

University who has authority to institute corrective measures on behalf of the University" which includes "[d]eans, senior staff, and all supervisory personnel." *Id.* at 3. As a result, faculty members were not obligated to report the allegations to the Title IX Coordinator. Without more information about who received these reports and what was done with the information, the amended complaint does not allege that Benedictine had actual notice of these reports.

Totten does, however, allege that in March 2018 the Benedictine Title IX Office investigated the Assailant. Benedictine clearly had actual notice of these allegations. A single instance of misconduct, however, does not rise to the level of Benedictine being on notice that the Assailant was a serial offender. Nor does the amended complaint adequately allege that Benedictine's response was inadequate in light of the known circumstances. To the contrary, Totten does not allege details regarding the outcome of the investigation including the conclusion as to Assailant's culpability or any remedial measures. For these reasons, the allegations regarding the Assailant's prior misconduct cannot serve as a basis for Title IX culpability.

Totten also alleges that despite concluding by a preponderance of evidence that Assailant sexually assaulted Totten on three occasions, Benedictine failed to take reasonable steps to

protect her from further harassment. This she alleges, rises to the level of deliberate indifference. Benedictine argues that its remedial actions were reasonable and Totten's dissatisfaction with Benedictine's response is not a basis for a Title IX claim.

Benedictine's response will only amount to deliberate indifference if it was "clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648. An educational institution's response has been deemed clearly unreasonable where it failed to enforce its own no contact order or take any steps to avoid a victim and her attacker being in the same classroom. *See Pogorzelska,* 442 F.Supp.3d at 1064. Both circumstances are present here.

Beginning in December 2018, BUPD repeatedly failed to enforce its own no contact order, despite Totten's reports of continued harassment by Assailant. (Am. Compl. ¶ 26.) BUPD's failure to "enforce its own No Contact Order is enough to state a Title IX claim as those actions (or inaction) could plausibly be clearly unreasonable under the known circumstances." *Pogorzelska,* 442 F.Supp.3d at 1064.

Moreover, in January 2019 Benedictine concluded, by a preponderance of evidence, that Assailant sexually assaulted Totten on three occasions. (Am. Compl. ¶ 31.) Despite this conclusion, and the prior no contact orders issued by BUPD and

- 18 -

DuPage County, the report's only remedial recommendation was that Assailant not be permitted to live on campus for the spring 2019 semester. (*Id.*) Benedictine also repeatedly ignored Totten's requests for accommodations, to avoid being in the same classes as Assailant. (*Id.* ¶¶ 40-41, 44.)

In short, Benedictine failed to enforce its own no contact order and the order issued by DuPage County and failed to provide any accommodations that would have allowed Totten to continue her education in a harassment-free environment. What is more, Masini's alleged statement that Benedictine would have handled Totten's situation different if she had "been a different kind of student" evidences that her requests did not fall through the cracks nor was Benedictine's ignorance an administrative oversight. Instead, viewing the facts in the light most favorable to Totten, Benedictine's failure to act and discuss accommodations was deliberate and "clearly unreasonable" in light of the circumstances. On this basis, Benedictine's motion to dismiss Count I is denied.

### 2. *Retaliation (Count II)*

Title IX prohibits educational institutions from retaliating against people who speak out against sexual harassment. *Jackson v. Birmingham Bd. Of Educ.,* 544 U.S. 167, 183 (2005). To establish a claim for retaliation in violation of Title IX Totten must allege:

(1) she engaged in a statutorily protected activity; (2) the school took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.,* 851 F.3d 690, 695 (7th Cir. 2017). Both parties agree that Totten's report of sexual assault to the Benedictine Title IX office was a statutorily protected activity. Benedictine argues that Totten has failed to plead the second and third elements—that Benedictine took materially adverse actions against her and that there was a connection between any claimed action and her sexual assault report.

The amended complaint lists twenty materially adverse actions taken by Benedictine. (Am. Compl. ¶ 84.) The Seventh Circuit defines an adverse action as "one that a reasonable [person] would find to be materially adverse such that the [person] would be dissuaded from engaging in the protected activity." *Burton*, 851 F.3d at 696 (quoting *Silverman v. Bd. of Educ.,* 637 F.3d 729, 740 (7th Cir. 2011)0. An adverse action is therefore more substantial than petty slights, minor annoyances, or mere inconveniences. *Id.; Yap v. Nw. Univ.,* 119 F.Supp.3d 841, 851 (N.D. Ill. 2015). While some of Totten's alleged adverse actions fall well below this standard—*i.e.,* publicizing a photo of Assailant or offering subpar course offerings—that Benedictine twice delayed her graduation

date sufficiently pleads an adverse action. *Yap,* 119 F.Supp.3d at 851.

The amended complaint, however, does not plead the necessary causation element. Like the plaintiff in *Pogorzelska,* Totten alleges that Benedictine was hostile to her when she sought help and failed to enforce BUPD's no contact order. *Compare Pogorzelska,* 442 F.Supp.3d at 1065 *with* Am. Compl. ¶ 84. Also consistent with *Pogorzelska*, Totten "simply did not plead that [Benedictine's] conduct (including its inactions) was intentional or based on a retaliatory motive." *Pogorzelska,* 442 F.Supp.3d at 1065. Indeed, nowhere does Totten allege that Benedictine's failure to accommodate her educational needs was done because of or in response to her filing a Title IX complaint. Instead, Totten alleges that Dean Masini told her that he would have handled her requests for accommodations differently if she had "been a different kind of student." (Am. Compl. ¶ 52(b)). While this statement certainly suggests there was an improper and biased motive behind Dean Masini's inaction, it does not evidence that his actions were done because Totten filed a report against the Assailant. Consequently, even taken in the light most favorable to the Totten, the Court cannot conclude that Benedictine's actions were retaliatory. For that reason, the Court grants Benedictine's motion to dismiss as to Count II without prejudice.

- 21 -

**B.   Title VI Discrimination –**
**Race & National Origin (Counts III and IV)**

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. As a threshold matter, Benedictine does not dispute that it receives federal financial assistance for its educational programs and is therefore subject to the prohibitions in Title VI.

Totten raises two Title VI discrimination claims against Benedictine. Specifically, Counts III and IV allege that Benedictine's treatment of Totten after she reported being sexually assaulted by Assailant and harassed by Roommate amounted to intentional discrimination on the basis of her race and national origin. Benedictine moves to dismiss both counts. For the reasons explained below, Benedictine's motion is denied as to Counts III and IV.

According to the amended complaint, Totten is a mixed race, Muslim woman. Totten alleges that Benedictine treated her less favorably than similarly situated peers of a different race or national origin. In support of her allegations, Totten heavily relies on a statement from Dean Masini during a March 2019 meeting.

- 22 -

According to Dean Masini, Benedictine would have handled Totten's Title IX complaint and reports of harassment different if she were "a different kind of student." (Am. Compl. ¶ 52.) Totten and her mother interpreted this comment as a reference to their race and/or Muslim faith. (*Id.*) Totten also alleges that during the same March 2019 meeting, Dean Masini informed her that in some instances a single allegation of sexual assault will lead to the perpetrator's expulsion. (*Id.*) Totten's situation, according to Dean Masini, did not qualify for this zero-tolerance treatment. (*Id.*) Finally, Totten alleges that following a harassing encounter with Roommate BUPD characterized the incident as "girl drama" and banned Totten, but not Roommate, from the Benedictine campus. (*Id.* ¶ 93.)

The Court evaluates Title VI allegations of discrimination using the same framework governing liability under Title VII. *Sawyer v. Columbia College,* 864 F.Supp.2d 709, 720 (N.D. Ill. 2012). Accordingly, Totten may rely on direct or indirect evidence to set forth a *prima facie* case of Title VI discrimination. *Id.* Threadbare allegations and/or conclusory statements are not sufficient to survive a motion to dismiss. *Khan v. Midwestern Univ.,* 147 F.Supp.3d 718, 720 (N.D. Ill. 2015).

To demonstrate discrimination under the direct method, Totten must provide "direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial

discrimination . . . ." *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.,* 6 F.Supp.3d 806, 816 (N.D. Ill. 2013), *aff'd*, 772 F.3d 443 (7th Cir. 2014) (quoting *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 393 (7th Cir. 2010)). "Direct evidence typically relates to the motivation of the decisionmaker responsible for the contested decision." *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir. 1999) (quotation marks omitted). Dean Masini held himself out as the primary decision maker for Benedictine's response to Totten's Title IX and harassment complaints. (Am. Compl. ¶ 52(b).) Consequently, a statement by Dean Masini regarding his motivation for those decisions could be direct evidence of discrimination.

Benedictine argues that the basis for Totten's Title VI claim— a single "stray" comment by Dean Masini—is insufficient direct evidence to survive a motion to dismiss. But even isolated comments "may constitute direct evidence of discrimination if they are "contemporaneous with . . . or causally related to the . . . decision making process" surrounding the challenged action. *Sheehan,* 173 F.3d at 1044. In *Sheehan,* the Seventh Circuit concluded that a supervisor's comment that by firing an employee she "would be happier at home with her children" was evidence of direct discrimination. *Id.* Specifically, the *Sheehan* court found that the comment drew on gender-based stereotypes and reflected "a propensity by the decisionmaker to evaluate employees based on

illegal criteria." *Id.* By contrast, in *Sawyer,* the court found that a professor's comment in a classroom that "you people need to learn how to turn your work in on time" was not direct evidence of discrimination. *Sawyer,* 864 F.Supp.2d at 720. The court concluded that "looking at the comment objectively, there is no way to know whether the comment was directed at a particular race or gender, or simply at her students in general." *Id.* at 721.

Masini's admission that he would have made different disciplinary and accommodation decisions if Totten were "a different kind of student" falls somewhere between the statements in *Sheehan* and *Sawyer.* Unlike the gender-stereotyped statement in *Sheehan,* Masini's comment did not obviously invoke any racial or ethnic stereotypes. Masini's statement was, however, narrower than the *Sawyer* statement. The statement in *Sawyer* was vague and could have pertained to a particular protected class, but also could have been a refence to all the professor's students in general as it was in the presence of the entire classroom. Here, a "different kind of student" refers to an unknown subgroup of students, meaning Dean Masini singled Totten out based on one or more of her characteristics.

At the pleading stage, the Court construes the allegations in the light most favorable to the Totten. Dean Masini was clearly referencing a characteristic of set of characteristics specific to

Totten. At this stage it is reasonable that these comments could refer to her race or national origin, and the Court therefore finds it closer to the discriminatory comment in *Sheehan*. For that reason, the Court finds that Totten has sufficiently plead direct evidence to sustain claims for race and national origin discrimination under Title VI.

To demonstrate discrimination under the indirect method, Totten must show that she (1) is a member of a protected class; (2) met the school's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated individuals outside of the protected class. *Lubavitch-Chabad of Illinois,* 6 F.Supp.3d at 817. Benedictine only argues that Totten's indirect evidence is insufficient because she fails to allege that Roommate was outside of her protected class. The Court disagrees. Totten alleges that she is a mixed-race woman of the Muslim faith. The amended complaint expressly states that Roommate was a "Benedictine student of a different race and national origin." (Am. Compl. ¶ 21.) There is no question that Roommate was treated differently than Totten and is outside of Totten's protected class.

Totten's allegations regarding BUPD and the Benedictine administration's failure to redress a number of harassing incidents by Roommate are concerning. When viewed in the light

- 26 -

most favorable to Totten, the allegations set out a pattern of treatment that ultimately led to Totten leaving Benedictine and delaying her graduation, while Roommate was permitted to remain on campus and enjoy her final semester of college. At this stage, the disparate treatment of two students from different racial and ethnic backgrounds reasonably leads to the inference that Totten was treated less favorably than similarly situated victims outside her protected classes.

Because Totten has sufficiently pled both direct and indirect evidence of race and/or national origin discrimination under Title VI, the Court denies Benedictine's motion to dismiss Counts III and IV.

### C.  State Law Claims

Counts V and VI of the amended complaint raise Illinois state law claims for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED"). The parties do not dispute that Illinois state law applies to these claims and the Court agrees. For the reasons set out below, the Court dismisses Counts V and VI.

#### 1.  *Negligence Infliction of Emotional Distress (Count V)*

In Count V, Totten alleges that Benedictine negligently inflicted emotional distress when it failed to provide adequate security in Becker Hall and around campus. According to the amended

complaint, Benedictine's inadequate security increased her risk of harm by Assailant and Roommate and ultimately led to multiple harassing interactions with both. Totten alleges that the altercations with Assailant and Roommate caused her severe emotional distress.

To state a claim for NIED, Totten must allege that: (1) Benedictine owed her a duty; (2) Benedictine breached that duty; and (3) her injury was proximately caused by that breach. *Parks v. Kownacki,* 737 N.E.2d 287, 296–97 (Ill. 2000). Illinois NIED claims are also subject to the "impact rule" which states that a "direct victim's claims for negligent infliction of emotional distress must include an allegation of contemporaneous physical injury or impact." *Schweihs v. Chase Home Fin., LLC,* 77 N.E.3d 50, 59 (Ill. 2016). Benedictine argues that Totten has failed to allege a contemporaneous physical injury or impact attributable to the university. Absent such allegations the amended complaint fails to plead a claim for NIED and must be dismissed. The Court agrees in part.

Count V lists four instances where Benedictine's alleged failure to provide adequate security led to altercations with Assailant and Roommate. Three of these incidents did not result in any physical impact or injury to Totten. The three alleged incidents involving Roommate describe verbal harassment and

Roommate making contact with objects in close proximity to Totten. While jarring, because these incidents failed to result in Totten being physically impacted as a result of Roommate's actions, they cannot form the basis for an NIED action. *Doe v. Loyola Univ. Chicago,* 2019 WL 3801819, at *3–*4 (N.D. Ill. Aug. 13, 2019).

Totten alleges one instance of physical contact which has caused her emotional trauma: Assailant forced his way into Totten's university apartment and threw her against the wall. This satisfies the impact rule. To survive a motion to dismiss based on this incident, Totten must set out allegations sufficient to plead the remaining elements of an NIED claim.

Totten alleges that Benedictine owed her a duty to use reasonable care for her safety. She further alleges that Benedictine breached that duty by failing to provide adequate security measures in Becker Hall, thereby allowing Assailant to enter her apartment and carry out this physical assault. But Benedictine did not have a duty to "protect [Totten] from the harmful acts of third parties." *Doe v. Columbia College,* 299 F.Supp.3d 939, 962 (N.D. Ill. 2017). Indeed, Courts consistently find "that the university-student relationship is not the type of 'special relationship' such that the university has a duty to protect students from the harmful acts of third parties." *Id.* (collecting cases). This is true even where, as is the case here,

the university exerts control over the location where the criminal act took place. *Id.* Because Benedictine did not have a duty to protect Totten, the assault by Assailant in her Becker Hall apartment cannot serve as the basis for an NIED claim.

For these reasons the Court grants Benedictine's motion to dismiss Count V with prejudice.

### 2. *Intentional Infliction of Emotion Distress (Count VI)*

In Count VI, Totten alleges that Benedictine's conduct, as alleged in the amended complaint, intentionally inflicted emotional distress upon her. According to the amended complaint, Benedictine knew that Totten was susceptible to emotional distress and there was a high probability that the school's conduct would cause her to experience emotional distress. (Am. Compl. ¶¶ 111-12.) Totten alleges that despite this knowledge Benedictine purposefully engaged in extreme and outrageous conduct in response to her reports of harassment and sexual assault. (*Id.*) This conduct caused her to experience fear, horror, worry, shame, anxiety, long lasting traumatic neurosis, post-traumatic stress disorder and depression. (*Id.* ¶ 113.)

To state a claim for IIED, Totten must allege: (1) conduct that is truly extreme and outrageous; (2) that Benedictine intended the conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe

emotional distress; and (3) that the conduct in fact caused severe emotional distress. *Schweihs,* 77 N.E.3d at 63. Benedictine argues that Totten has not alleged conduct that is extreme and outrageous and as a result her IIED claim must be dismissed. The Court agrees.

"Illinois has a high standard for extreme and outrageous conduct." *Reyes v. Walker,* 2018 WL 6062320, at *6 (N.D. Ill. Nov. 19, 2018). To sustain an IIED claim, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs,* 77 N.E.3d at 63 (quoting Restatement (Second) of Torts § 46 cmt. D at 73 (1965)). An IIED claim fails where the complained of conduct is "inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair." *Oates v. Discovery Zone,* 116 F.3d 1161, 1174 (7th Cir. 1997) (quotation marks omitted). Indeed, "actions may fall short of extreme and outrageous conduct even if they cause 'fright, horror, grief, shame, humiliation, [or] worry'" *Fields v. Jackson,* 2017 WL 4150682, at *5 (N.D. Ill. Sept. 19, 2017).

The amended complaint alleges instances of rude, uncooperative, and unfair conduct by Benedictine administration and BUPD. Totten alleges that she was repeatedly inconvenienced, ignored, and treated worse than her aggressors. The Court does not condone any of the alleged actions taken by Benedictine, its

administration and staff, or its police department. As pled these allegations are sufficient to sustain claims under Title IX and Title VI. The alleged conduct cannot, however, does not rise to the level of extreme and outrageous. As a result, Totten has not adequately pled the first element of an IIED claim.

Even if Totten plausibly alleged extreme and outrageous conduct, the amended complaint fails to allege facts evidencing the second and third elements of an IIED claim. When pleading an IIED claim, a litigant cannot rely on boilerplate allegations that the defendant intended to inflict emotional distress and actually did so. *Columbia College Chicago,* 299 F.Supp.3d at 964. Nevertheless, the amended complaint relies on conclusory statements to satisfy the second and third elements. Totten states that Benedictine knew or should have known that she was particularly susceptible to emotional distress. (Am. Compl. ¶¶ 111–12.) But she fails to plead any facts to support that conclusion. Similarly, Totten dedicates just one paragraph to listing the impact of Benedictine's conduct on her emotional health. (*Id.* ¶ 113.) She again offers no facts to support the alleged ailments listed. This list is insufficient to establish that the impact on Totten was extreme.

For these reasons the Court grants Defendant's motion to dismiss Count VI without prejudice.

- 32 -

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court grants in part and denies in part Defendant's motion to dismiss Plaintiff's amended complaint. (Dkt. No. 19.) Count V is dismissed with prejudice. Counts II and VI are dismissed without prejudice. Totten may file a second amended complaint within thirty (30) days of the entry of this Opinion and Order. Failure to do so will convert the Order on Counts II and VI to one with prejudice.

**IT IS SO ORDERED.**

_____
       Harry D. Leinenweber, Judge
       United States District Court

Dated: 8/2/2021

- 33 -