Exhibit 4

1

UNITED STATES DISTRICT COURT FOR THE NORTHERN

DISTRICT OF ILLINOIS, EASTERN DIVISION

FATIMAH TOTTEN,                    )
    Plaintiff,                    )
        -vs-                      )  No. 1:20-cv-06107
BENEDICTINE UNIVERSITY,            )
    Defendant.                    )

        The discovery deposition of
ERICA PADISH-HOEBING, called by the plaintiff
for examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before CARLA P. LETELLIER, a
C.S.R. and Registered Professional Reporter
within and for the County of Lake, State of
Illinois, taken via Zoom conference, commencing
at the hour of approximately 10:00 a.m. on the
2nd day of March 2023.

### Page 58

1  right?
2  A. Yes.
3  Q. Okay. And you write to Ms. [redacted]
[redacted]
[redacted]." Do you see
6  that?
7  A. Uh-huh.
8  Q. Whose Title IX complaint are you
9  referring to there?
10  A. I don't know whose Title IX complaint.
11  Q. Is the Title IX complaint that you
12  refer to there a different Title IX complaint
13  than the one that you referred to in your
14  email to Clare [redacted]?
15  A. No, it was the same. It was the same
16  investigation. I just don't recall who filed
17  the complaint.
18  Q. So only one student filed a Title IX
19  complaint against Marquis Dixon?
20  A. I don't recall. I think so, yeah.
21  Q. Do you know whether only one student
22  made a complaint against Marquis Dixon?
23  A. I don't recall.
24  Q. Do you know whether two students made

### Page 59

1  a Title IX complaint against Marquis Dixon?
2  A. I think it was indicated there's more
3  than one, but I don't know.
4  Q. Where would it be indicated if there
5  was more than one Title IX complaint against
6  Marquis Dixon?
7  A. I don't know. Somewhere in my notes.
8  I don't know. I don't recall.
9  Q. Okay. Why did you want to interview
10  Ms. [redacted] as part of your Title IX
11  investigation?
12  A. I assume that she was -- someone
13  mentioned her.
14  Q. I think you said I assume that
15  someone mentioned her, do you know why --
16  A. No.
17  Q. (Continuing.) -- you wanted to
18  interview Ms. [redacted] as part of your Title IX
19  investigation?
20  A. She must have been involved in some
21  way, but that's all I know.
22  Q. But you can't remember anything about
23  why she was involved or how she was involved?
24  A. No.

### Page 60

1  Q. Did you provide Tecianna with
2  information about Benedictine's Title IX
3  policy in this email?
4  A. Every student was informed of the
5  Title IX policy. I didn't -- this is the email
6  that they all received information at the
7  beginning of the year. They were so informed.
8  Q. Thank you. My question is a little
9  different.
10  Did you provide Tecianna with a
11  copy of Benedictine's Title IX policy in this
12  email?
13  A. There'd be no reason to, so no.
14  Q. So you did not provide a copy of --
15  A. In this email?
16  Q. (Continuing.) -- the Title IX
17  policy -- well, let me just get my question
18  out so we've got a nice, clean record here.
19  So let me just ask one more time.
20  So you did not attach a copy of
21  Benedictine's Title IX policy to this email to
22  Tecianna --
23  A. Not to this email.
24  Q. Did you ever attach a copy of

### Page 61

1  Benedictine's Title IX policy to an email to
2  Tecianna?
3  MR. FRAMBES: Objection --
4  THE WITNESS: Go ahead.
5  MR. FRAMBES: I'm sorry.
6  I just said objection, asked and
7  answered.
8  Erica, go ahead.
9  BY THE WITNESS:
10  A. Okay. Every student received a copy
11  of the Title IX policies and procedures at the
12  beginning of the school year; so yes, I had
13  provided her with it before. Not in this email,
14  though.
15  BY MS. GALKA:
16  Q. My question is just a little
17  different.
18  So did you ever email Tecianna
19  with a copy of Benedictine's Title IX policy?
20  A. Yes. I emailed every student in the
21  university a copy of the Title IX policy every
22  year, yes.
23  Q. And so you just assumed that because
24  Tecianna was a student that she got an email

**Page 62**

1 from you?
2     MR. FRAMBES: Objection. Misstates
3 testimony.
4 BY THE WITNESS:
5     A. Well, she did get one. She was a
6 student, so yes.
7 BY MS. GALKA:
8     Q. You know for a fact that Tecianna
9 received an email from you attaching
10 Benedictine's Title IX policy?
11    A. Yeah, I sent it to her student email.
12    Q. When did you send it to her student
13 email?
14    A. I sent it to every student at the
15 beginning of the year.
16    Q. Do you recall what day you sent it to
17 Tecianna?
18    A. I don't recall the day, no.
19    Q. How do you know that Tecianna
20 received an email from you?
21    A. Because I know that I sent it out to
22 every student. And they all had to have
23 received it and perform the training. And I
24 would have a list of all the students that

**Page 63**

1 completed the training. So I knew who received
2 it and it was sent out to every student.
3     Q. Turning back to our exhibit here,
4 this February 19, 2018 email, did you in this
5 email inform Tecianna of resources available
6 for sexual assault survivors on Benedictine's
7 campus?
8     A. No, I mean, this is my email, so this
9 is whatever I said to her.
10    Q. Okay. And then moving forward in
11 time in this email chain, you don't have to
12 read it all, but it looks like you did set up
13 a meeting with Tecianna; is that right?
14    A. I'm assuming so, yeah.
15    Q. Did you meet with Tecianna in
16 connection to a Title IX complaint?
17    A. I believe I did.
18    Q. Do you know if you met with Tecianna
19 in connection to a Title IX complaint?
20    A. I recall meeting with her in person,
21 yeah.
22    Q. What do you recall Tecianna telling
23 you in that meeting?
24    A. Whatever is in my notes. I don't

**Page 64**

1 recall what was said in the meeting. I just
2 recall meeting her.
3     Q. Okay. So you have no independent
4 recollection of what Tecianna told you in that
5 meeting?
6     A. No, I don't.
7     Q. Do you know what you told Tecianna in
8 that meeting?
9     A. No.
10    Q. All right. Let me take that down.
11       Did you take notes during your
12 February 2018 meeting with Tecianna.
13    A. I believe so, yes.
14    Q. Let me switch back to your notes.
15 All right. So we're back to Exhibit 2 here.
16    A. Okay.
17    Q. And we're on page 14.
18       Are these your notes from your
19 in-person meeting with Tecianna ▇?
20    A. It looks like it, yeah.
21    Q. And in parentheses next to Tecianna
22 you write, ▇ Do you see that?
23    A. Uh-huh.
24    Q. What does that mean?

**Page 65**

1     A. I don't recall. Possibly victim slash
2 witness. I don't know.
3     Q. Okay. Your next note says, "▇
4 ▇."
5       Do you see that?
6     A. Uh-huh.
7     Q. Who is M?
8     A. I'm assuming Marquis, but I'm not
9 really -- I'm not -- I think that's who it is.
10    Q. Do you know if the M refers to
11 Marquis?
12    A. I don't know who else it would be,
13 so -- I would think that's him.
14    Q. So you know that it was Marquis that
15 you're referring to with the M?
16    A. I don't know who else it would be so I
17 assume that that's him.
18    Q. But my question is, do you know that
19 the M there refers to Marquis?
20    A. It was so long ago and I -- yes, I'll
21 say yes, but like I -- I don't know who else it
22 would be referring to, so yes.
23    Q. Okay. And then this next note, I'm
24 kind of skipping down one, it says, "▇

**Page 74**

1  make -- I don't know.
2      Q.  Okay.  Do you know --
3      A.  He said do what you're going to do.
4  It wasn't meant to happen.
5      Q.  Returning to this first dashed note
6  here, do you know who the he is when you wrote
7  he there?
8      A.  No, because it says, "[redacted]
9  [redacted]
10 [redacted]."
11     I mean, I would assume this is
12 Marquis, because that's who this whole
13 investigation is about, so...
14     Q.  Do you know that you were referring
15 to Marquis there?
16     A.  I don't who know who else I would be
17 referring to, so I know that you need an
18 definitive answer, but I -- I don't recall this
19 interview and I assume that's who it was.
20     Q.  So you don't know for sure that you
21 were referring to Marquis Dixon in those
22 notes; right?
23     A.  I would -- I would say it's him,
24 yeah.  I mean, there's no one else it would be

**Page 75**

1  about.
2      Q.  So you do know that you're referring
3  to Marquis Dixon there?
4      A.  Yeah.
5      Q.  Okay.  And then this last note says,
6  "[redacted]."
7  Do you see that?
8      A.  Yeah.
9      Q.  What does that note mean?
10     A.  I couldn't put it into context for
11 you.  I typically just wrote a few things that I
12 heard in my interviews so I don't know.
13     Q.  Do you know if [redacted] told you she
14 didn't want it to happen to anyone else?
15     A.  I don't know.
16     Q.  Do you know what the it is in that
17 sentence?
18     A.  I don't.
19     Q.  Okay.  At your meetings with
20 Tecianna -- actually, let me strike that.
21            At your last meeting with
22 Tecianna in person, did you tell her what the
23 next steps of your investigation would be?
24     A.  That was typically my practice is to

**Page 76**

1  do that so no one was left in the dark.  I would
2  tell them what to expect so they weren't anxious
3  or left unknowing, so I most likely did.
4      Q.  But you don't know whether or not you
5  did?
6      A.  I don't remember the exact
7  conversation but that was my practice.
8      Q.  Okay.  Just to sort of speed this up
9  here.  Is it a fair summary of your testimony
10 that you don't remember anything that was said
11 in your meetings with Tecianna [redacted]?
12     A.  That's fair to say, yeah, I don't
13 remember.  I don't recall the conversation.
14     Q.  Okay.  And is it a fair summary of
15 your testimony that you don't know anything
16 that was said in your meeting with Clare
17 [redacted]?
18     A.  I don't recall the conversation.
19     Q.  Okay.  And then lastly, is it fair to
20 say that you don't know anything that was
21 discussed during your meeting with Brittani
22 [redacted]?
23     A.  That's what I'm saying, yeah, I don't
24 recall.

**Page 77**

1      Q.  Okay.  Did Brittani [redacted] ever put a
2  statement related to this Title IX
3  investigation in writing?
4      A.  Not that I recall and I didn't
5  remember seeing that in my notes.
6      Q.  Okay.  Did you ever write up a
7  statement for Brittani [redacted] to sign based on
8  your interview with her?
9      A.  Yeah, I would have written up a
10 summary of everyone's interview and then they
11 signed it and then we'd go over it together.
12     Q.  I think you said would have there, so
13 just to follow up:  Did you write up a summary
14 of what Brittani said?
15     A.  Yeah.  And I don't -- I don't know why
16 we can't find the actual report, but every time
17 I would do an interview with a student, I would
18 type up a summary of our interview and I'd have
19 them come in to make sure I got everything
20 right, and then they would sign it.  And that
21 would be part of my -- my final report.
22     Q.  Would there be email correspondence
23 showing you giving it to Brittani --
24     A.  Should be, yeah.

**Page 78**

Q. Sorry, let me just finish my whole question.

So would there be email correspondence showing you sending Brittani her statement for her to review and approve?

A. Yes.

Q. Have you looked for that email correspondence?

A. No.

Q. Do you have any reason to believe that Benedictine would have destroyed that email correspondence?

A. No. I think they went through a couple IT people since I was gone. I know in the short time I was there, we went through quite a few IT people and IT companies because I reviewed the contracts. So I can understand how that might have gotten lost in limbo, but I have no reason to look for it but I have no reason to doubt that it's not there.

Q. What did the written statement that you provided to Brittani ▮ for her review and approval, what did it say?

A. It would have just been a summary of

**Page 79**

the handwritten notes that I had. I would just go off of those and then just do a summary.

Q. Do you remember what she told you that you would have put in that statement?

A. Nothing other than what's in the handwritten notes.

Q. So are you telling me that if something that Brittani told you didn't make it into your handwritten notes, that it would not have made it into her statement?

A. That is correct, yeah.

Q. Okay. Do you know that for sure or is that just your assumption based on your practice?

A. I know it for sure.

Q. Have you seen recently the statement that you provided to Brittani ▮?

A. No.

Q. And when is last time that you would have seen that statement?

A. It would have been years ago. That's just how I did it. I would do all of my interviews and then I would do the final report for it all at the same time. So there would be

**Page 80**

no reason why something else that's not in my handwritten notes would be put into one of the statements.

Q. Did Clare ▮ provide a written statement concerning a -- this Title IX investigation?

A. Since there's handwritten notes from her and I did an interview, yeah, and it would have -- her statement would have been the same thing, just a summary of my notes.

Q. Do you know that you sent to Clare a statement for her to review and approve?

A. It's what I did after every interview. If I interviewed someone, then I would make a summary of their interview and I would sign it.

Q. Do you know that you did that for Clare ▮?

A. Yeah. Yeah, I would have done that since I had the notes.

Q. How do you know that you did that?

A. It was my practice.

Q. Do you remember sending Clare ▮ her statement for review?

A. I don't recall sending her the email,

**Page 81**

I mean, it was so long ago, but I know my practice and I know how I did my job and that's what I did.

Q. So you -- I'm sorry, go ahead.

A. That's as clear as I can be and as much as I know.

Q. Yeah. And just so that I'm clear and we've got a clear record, do you know for certain that you sent Claire ▮ a statement for her to review?

A. I don't know for certain. I just know that that's my practice.

Q. Okay. Did you send Tecianna ▮ a statement related to the interview that she gave to you for her to review?

A. With her, I'm sure I would have especially because I had her written as victim in one of the interviews. So yes, I can say with certainty I sent it to her.

Q. When did you send that to her?

A. I don't recall.

Q. Well, would that have been an email to Tecianna ▮?

A. Yes.

### Page 82

1  Q. Did you look for that email prior to
2  your deposition today?
3  A. No, I have no access to my Benedictine
4  email.
5  Q. Do you have any reason to believe
6  that Benedictine would have destroyed that
7  email?
8  A. No.
9  Q. Okay. Did you send Marquis Dixon a
10 statement for him to review and approve?
11 A. I'm sure I would have, yes.
12 Q. Do you know for certain that you sent
13 him a statement for him to review and approve?
14 A. Yes.
15 Q. When did you send that statement?
16 A. I don't recall.
17 Q. How do you know that you for sure
18 sent him a statement to review and approve?
19 A. Because it would have been part of the
20 final report, and I wouldn't submit a final
21 report without the victim -- or like without at
22 least his interview statement. That's -- I just
23 wouldn't have submitted that because -- I
24 couldn't have.

### Page 83

1  Q. Did Marquis Dixon receive any
2  sanctions as a result of the February 2018
3  Title IX investigation?
4  A. I don't recall because I don't recall
5  the final report, but my practice was, even if
6  they weren't found guilty of any violations of
7  the student code, they still received extra
8  training via an online training program.
9        And so even if they were accused of
10 it, I would require them to complete an extra
11 online training program. And that I would
12 contact the online training people and they
13 would unlock a separate portal for these
14 students.
15       So even if he wasn't found guilty,
16 he would have had to complete that.
17 Q. And are you saying that because
18 that's your practice or do you remember
19 telling Marquis Dixon that he had to take
20 additional training?
21 A. That was my practice. That's what I
22 did for every case.
23 Q. So do you know for certain that you
24 made Marquis Dixon take additional training?

### Page 84

1  A. I don't know for certain, but it's
2  what I did for -- I mean -- I'm an attorney so
3  it's hard for me to say with certainty, but that
4  was my practice. Every time a student even got
5  accused of it, I figured there was some reason
6  that we needed to just do some extra training.
7  So there's no reason I wouldn't have.
8  Q. Do you have a specific memory of
9  telling Marquis Dixon that he had to take
10 additional training?
11 A. I don't have a specific memory of
12 that.
13 Q. Okay. For the students for whom you
14 sent written statements to for their approval,
15 would they have sent those statements back to
16 you with their signature?
17 A. Yeah. I think they were either sent
18 back or they dropped them off at my office.
19 Q. Where would you take those
20 statements?
21 A. In the file associated with the
22 investigation.
23 Q. What type of file did you keep for
24 this Title IX investigation?

### Page 85

1  A. I know I had a hard copy. I think --
2  I may have scanned things in as well, but I know
3  I kept everything in hard copy.
4  Q. And so was the hard copy file sort of
5  like a folder with documents in it?
6  A. Yeah.
7  Q. Okay. And you don't know if you kept
8  an electronic file?
9  A. I don't -- I don't recall.
10 Q. What are the documents that you kept
11 in the hard copy file related to this Title IX
12 investigation?
13 A. I would have kept the summary of
14 interviews, my handwritten notes, and then the
15 report final, and then if there was any police
16 reports.
17 Q. Where did you keep that physical
18 file?
19 A. In a file cabinet in my office.
20 Q. When you left Benedictine, what
21 happened to that file?
22 A. I think Tammy Sarver had everything.
23 Nancy was in control of my office so that was
24 the contracting compliance office. So there was

Page 86

1  just three offices in one larger office in the
2  union.
3      And so Nancy had control of it and I
4  think she gave it over to Tammy.
5      Q.  Okay.  So you didn't take that file
6  with you to Arizona --
7      A.  No.
8      Q.  (Continuing.) -- right?  Okay.
9      A.  No.
10     Q.  Did you give the file to Nancy before
11 you left or did you leave it in the file
12 cabinet?
13     A.  I just left it in the file cabinet.
14     Q.  Okay.  And I think you've testified
15 that there was a final Title IX report related
16 to the February 2018 Title IX investigation of
17 Marquis Dixon?
18     A.  Yes.
19     Q.  Where is that final Title IX report?
20     A.  I don't know.  I would have emailed it
21 to Marco and the president and then had a hard
22 copy in -- Nancy, I think.  I don't know where
23 it's at.
24     Q.  Do you know for sure that you wrote a

Page 87

1  final Title IX report related to the Title --
2      A.  Yes.
3      Q.  (Continuing.) -- IX investigation?
4      And let me just get my full
5  question out.
6      So do you know for sure that you
7  wrote up the final Title IX report related to
8  the Title IX investigation of Marquis Dixon?
9      A.  Yes.
10     Q.  What did that final Title IX report
11 say?
12     A.  I don't recall.  I don't recall.
13     Q.  Do you know what any of the
14 conclusions in the final Title IX report were?
15     A.  I think it was unfounded, but I don't
16 recall summaries, I don't recall -- I mean,
17 based on my handwritten notes, I believe it was
18 unfounded.
19     Q.  What in your handwritten notes makes
20 you believe that it was unfounded?
21     A.  Because I don't have a final page
22 explaining -- like, I would typically write out
23 a summary if I was going to have a founded
24 finding.  There is nothing here that indicates

Page 88

1  that.
2      Q.  So your basis for saying that you
3  think it was unfounded is that there was no
4  summary in your notes?  Is that about right?
5      A.  Yes, and I don't remember having this
6  as a founded.
7      Q.  Okay.  So you don't know one way or
8  another whether you found Marquis Dixon
9  responsible in connection with the Title IX
10 complaint?
11         MR. FRAMBES:  Objection.  Misstates
12 testimony.
13 BY THE WITNESS:
14     A.  I don't recall having this as a
15 founded complaint, so...
16 BY MS. GALKA:
17     Q.  Do you recall having it as an
18 unfounded complaint?
19     A.  I don't recall.
20     Q.  So you don't recall one way or the
21 other what the conclusion was in the final
22 Title IX report concerning Marquis Dixon?
23     A.  I believe it was unfounded based on my
24 handwritten notes and my dim recollection of

Page 89

1  interviews and the investigation.
2      Q.  I think you said "believe" there.
3      Do you know that your finding was
4  that he was not responsible for whatever the
5  person complained of in the Title IX
6  complaint?
7      A.  Yes, he was -- it was unfounded.  I
8  just don't know what I had him do after the
9  fact, but -- yes.
10     Q.  Well, what are you looking at there,
11 Ms. --
12     A.  I was looking at my handwritten notes
13 and the police report.  And nothing in my notes
14 indicates that I had this as a founded
15 complaint.
16     And I recall doing a thorough
17 investigation, especially with the black student
18 union, there was a big issue with that, and
19 talking to their mentor and their -- the head of
20 the black student union and kind of dotting of
21 my I's and crossing of my T's, and I do remember
22 it was lengthy investigation and I'm telling you
23 I think it was unfounded.  I don't have the
24 report in front of me, but that's what I

**Page 94**

Dixon?

A. I would have recommended, like I said, I recommended for all students that I had to do investigations for, extra training. I don't recall what I had for him.

Q. And I believe you said that you sent the final Title IX report via email to Marco Masini; is that right?

A. Yeah. So Marco would sign off on it and then we'd send it to president Brophy.

Q. Did Marco Masini sign off on your final Title IX report related to this investigation?

A. Yes, he would have.

Q. Do you know for sure that he did?

A. Yes.

Q. How do you know that?

A. Because he didn't sign -- he'd never not signed off on any of my investigations.

Q. Do you know for sure that he signed off on this Title IX investigation?

A. Yes, because he never not signed off on any of my investigations.

Q. Are you saying that you know that he

**Page 95**

signed off because he always signed off, or do you have a specific memory of him signing off on this Title IX investigation?

A. It's specific because he never didn't sign off.

Q. Did the president of Benedictine sign off on your Title IX report --

A. Yes.

Q. (Continuing.) -- and investigation?

A. Uh-huh.

Q. Where would he have signed off on it?

A. I don't recall exactly how he sent it out, but I think he would send it to the student or he would send me an email approving it or maybe he signed off physically. I don't remember how the final sign-off was, but it was --

Q. So you're talking about the form of his signing off on your final Title IX report related to this investigation?

A. I think I had a line that he would sign off on that would be typical of my reports. But to be honest with you, I don't remember the exact form of it.

**Page 96**

Q. Okay. So you're sure that he signed off but you don't remember --

A. Yeah.

Q. (Continuing.) -- when he signed off --

A. Yes.

Q. Let me just ask a fresh question.

You're sure that he signed off on your final Title IX report, but you don't know how he signed off?

A. Yeah, that's correct.

MS. GALKA: Okay. Carter and Ms. Padish-Hoebing, I want to take another break. I think it will help me to kind of tighten up what I have left so we can get moving a little quicker. Is that all right?

MR. FRAMBES: Yeah, that's fine. Do you want ten minutes?

MS. GALKA: Ten is good. Yeah, thanks.

THE WITNESS: Okay.

(Recess taken.)

BY MS. GALKA:

Q. I think that you testified that the

**Page 97**

signed written statements by the students that you interviewed were given to you via email or dropped off at your office; is that right?

A. Yes, that's correct.

Q. Which students emailed you copies of their signed statements?

A. I don't recall. It would have been one or the other, signed or dropped off.

Q. But you don't know what students emailed you copies of their signed statements?

A. No, I don't.

Q. Do you know what students dropped off copies of the signed statements?

A. No, I don't recall.

Q. When a student -- if a student involved in this case dropped them off in your office, what would you have done with them?

A. I'm sure I would have scanned it and put it in the file in my computer and then printed it with the final report and then put the actual copy in the hardcopy file.

Q. Did you have an electronic file related to this Title IX investigation?

A. Most likely I did.

**Page 98**

1 Q. Do you know for sure that you had an
2 electronic file related to this investigation?
3 A. I would have had a file on my computer
4 related to this investigation, yes.
5 Q. Do you know that you had an
6 electronic file on your computer related to
7 this investigation?
8 A. Yes, because I would have saved my
9 final report to the -- as a Word document on my
10 computer, yeah.
11 Q. Is the only basis for your testimony
12 that you had an electronic file that you would
13 have normally saved records there?
14 A. Yeah.
15 Q. So you don't have a specific memory
16 of your electronic file related to this
17 Title IX investigation?
18 A. Every investigation I did I would have
19 had an individual file on my computer.
20 Q. Do you have a specific memory of an
21 electronic file related to this Title IX
22 investigation concerning --
23 A. Yes.
24 Q. (Continuing.) -- Marquis Dixon.

**Page 99**

1 A. Yes.
2 Q. Okay. What was in the file?
3 A. It would have been my typewritten
4 summaries of all of the interviews and then the
5 final report. And any other documents related
6 to it I would have saved on there.
7 Q. Do you know for sure that you saved
8 those documents --
9 A. Yes.
10 Q. (Continuing.) -- to the electronic
11 file?
12      About how many documents did you
13 save --
14 A. Yes.
15 Q. (Continuing.) -- to your electronic
16 file?
17 A. I don't recall the number.
18 Q. Where would that electronic file have
19 gone once you completed your Title IX
20 investigation?
21 A. So I had a laptop that I used in my
22 office and I'd put it like -- I used it as a
23 desktop. And I'd put it on my desktop wherever
24 I got to the office. And just everything stayed

**Page 100**

1 on my desktop. I'm not really sure what the
2 network was like or what IT was like because IT
3 was constantly changing, so just everything was
4 kept on my laptop.
5 Q. Was the electronic file related to
6 this Title IX investigation saved to your
7 desktop or was it saved to a Benedictine
8 server?
9 A. I don't recall.
10 Q. Who had access to your electronic
11 file on this Title IX investigation?
12 A. Nancy would have if it was to the
13 server. I believe it was. But Nancy would have
14 had access to it. She would have been the only
15 other one.
16 Q. Did you ever email anyone a copy of
17 your electronic file?
18 A. I did. Whenever I issued a report,
19 I'd email it to Nancy first for approval, and
20 then I'd email it to Marco and then I'd email it
21 to the president.
22 Q. Did Nancy sign off on your final
23 Title IX report related to this Title IX
24 investigation of Marquis Dixon?

**Page 101**

1 A. Yes, she would have.
2 Q. Did she sign off on it?
3 A. Yes.
4 Q. Did Marco Masini sign off on your
5 final Title IX report related to Marquis
6 Dixon?
7 A. Yes.
8 Q. And when I say sign off, does that
9 mean he put his signature on the report?
10 A. Again, I forget how the formatting of
11 my reports were, but it would have either been
12 in a written form saying, yes, I approve this,
13 or he would have signed physically.
14      I don't remember how he did that,
15 but it would have -- I made sure that I had
16 everything in writing.
17 Q. Do you know if Marco Masini signed
18 the actual copy of the final Title IX report?
19 A. Again, I don't remember the exact form
20 of how I did my reports, but I believe so. And
21 if he didn't physically sign, he sent me an
22 email saying I approve, so.
23 Q. So you don't know whether he put his
24 signature on the final --

**102**

1   A.  I don't.
2   Q.  (Continuing.) -- Title IX report?
3   A.  I don't remember.
4   Q.  And you don't know whether he emailed
5   you his sign off on the final Title IX report;
6   right?
7   A.  I would have had an email from him,
8   though.  Like even if he signed it, he would
9   have sent me it via email.
10  Q.  Okay.  Did the president put a
11  physical signature on the final Title IX
12  report?
13  A.  Yes.
14  Q.  Would he have emailed you to sign off
15  on the final Title IX report?
16  A.  Yeah, I would have emailed to him that
17  he had to sign off on it and send it back.
18  Q.  Okay.  Do you know that he emailed
19  you his sign off on the final Title IX report?
20  A.  Yes.
21  Q.  Was the final -- was there one final
22  Title IX report or were there multiple final
23  Title IX reports related to Marquis Dixon?
24  A.  One.

**103**

1   Q.  Was the Title IX report one document
2   or did it consist of multiple documents?
3   A.  Like I said, it was the summary of the
4   investigation, the summary of all the
5   interviews, and then my -- my recommendation and
6   signatures of all those involved.
7       So it was comprised of one actual
8   report, but multiple topics in it.
9   Q.  Were there any attachments to the
10  final Title IX report about Marquis Dixon?
11  A.  That's everything that was in it so
12  that's all I recall.  I don't know if there was
13  police reports.  I don't -- I believe there was
14  police reports.  I'm not sure.  If there were
15  police reports, they would be attached to it as
16  well.  Any related documents would be attached.
17  Q.  Do you know if any documents were
18  attached to the final Title IX report related
19  to Marquis Dixon?
20  A.  I don't know.
21  Q.  Do you know if your final Title IX
22  report related to Marquis Dixon listed the
23  documents you considered in your
24  investigation?

**104**

1   A.  I'm sorry, can you repeat that?
2   Q.  Do you know if your final Title IX
3   report listed the documents you reviewed as
4   part of your Title IX investigation?
5   A.  Yeah, I would have listed those.
6   Q.  Do you know for sure that the
7   Title IX report listed the documents --
8   A.  Yes.
9   Q.  (Continuing.) -- that you reviewed --
10  let me ask my full question.
11      Do you know for certain that your
12  final Title IX report listed all of the
13  documents you considered as part of your
14  Title IX investigation?
15  A.  Yes.
16  Q.  As specifically as you can, what
17  documents did you review as part of your
18  Title IX investigation?
19  A.  I don't recall.  It would have been
20  witness interviews, a summary.  I don't recall
21  what else I reviewed.
22  Q.  Do you know that you reviewed witness
23  interviews as part of your final Title IX
24  report?

**105**

1   A.  Yes.
2   Q.  Do you know that -- well, let me
3   strike that.
4       What else did you review as part
5   of your Title IX investigation related to
6   Marquis Dixon?
7   A.  I don't recall what else I reviewed.
8   Q.  Okay.  How many pages was your final
9   Title IX report related to Marquis Dixon?
10  A.  I don't recall.
11  Q.  Was it one page?
12  A.  I don't recall.  I'm assuming it was
13  more than one because there was so many
14  interviews.
15  Q.  But you don't know whether it was
16  more than one page?
17  A.  No, I don't.
18  Q.  Did the final Title IX report related
19  to Marquis Dixon have multiple sections?
20  A.  Multiple sections, you mean like
21  multiple -- can you rephrase that?
22  Q.  What was the format of your final
23  Title IX report?  How was it structured?
24  A.  So like I said, the report is the

```
                                                    106
 1   summary, it was interviews, it was -- if there's
 2   a police report involved, that was included.
 3   And that was my investigation.
 4       Q.   Do you know that your recommendations
 5   were included in the final Title IX report?
 6       A.   Yes.
 7       Q.   Do you know if there was a police
 8   report included in the final Title IX report?
 9       A.   I don't know.
10       Q.   I think you mentioned that there was
11   a summary.
12            Is that a section that was
13   involved in your Title IX report?
14       A.   Yes.
15       Q.   What did the summary in your final
16   Title IX report say?
17       A.   I don't recall.
18       Q.   What was the next section after the
19   summary in your final Title IX report?
20       A.   It would be summary, interviews, and
21   then any associated documents, and then my
22   recommendations.
23       Q.   How many interview notes were
24   included in your final Title IX report?
```

```
                                                    107
 1       A.   I don't recall.  All I have is the
 2   handwritten notes so I don't recall.
 3       Q.   Do you know for sure that there was a
 4   section summarizing interviews in your final
 5   Title IX report?
 6       A.   Yes.
 7       Q.   But you don't know how many
 8   interviews were summarized.  Was there one
 9   interview summarized?
10       A.   I'm sure there was one.
11       Q.   Whose interview was it?
12       A.   It would have been the victim's and
13   then the respondent and then any other
14   witnesses.  I don't know how many at this point.
15   I don't recall.
16       Q.   How many victims were there involved
17   in this Title IX report?
18       A.   I don't recall.
19       Q.   How many witnesses were there
20   involved in your final Title IX report?
21       A.   All I have is my handwritten notes, so
22   I'm not sure if that's everything.  That's all I
23   had to review.
24       Q.   How did you receive a copy of your
```

```
                                                    108
 1   handwritten notes in advance of this
 2   deposition?
 3       A.   Carter had sent it to me.
 4       Q.   So you didn't maintain those
 5   personally in a file; is that right?
 6       A.   That's correct.
 7       Q.   Is there any reason you can think of
 8   why Benedictine would have your handwritten
 9   notes but wouldn't have your final Title IX
10   report?
11            (Technical interruption.)
12            MS. GALKA:  We're ready and, Carla, we
13   can go back on.  And would you please read back
14   the last question.
15            (Whereupon said record was read
16             back as follows:  "Is there any
17             reason you can think of why
18             Benedictine would have your
19             handwritten notes but wouldn't
20             have your final Title IX
21             report?")
22   BY THE WITNESS:
23       A.   No.
24   BY MS. GALKA:
```

```
                                                    109
 1       Q.   Is there any reason you can think of
 2   that Benedictine would have your emails to
 3   Tecianna and Clare ▮▮▮▮▮ and Marquis Dixon
 4   but wouldn't have your final Title IX report?
 5       A.   No.
 6       Q.   Is there any reason you can think of
 7   that Benedictine would have your emails that
 8   we looked at related to Tecianna and Clare and
 9   Marquis but wouldn't have any other of your
10   emails related to this investigation?
11       A.   No.
12       Q.   With as much specificity as possible,
13   please tell me what was contained in your
14   final Title IX report related to Marquis
15   Dixon?
16       A.   Again, what I would recall being in
17   there is a summary of my investigation, which is
18   the procedures that I went through during my
19   investigation, summary of my findings, my
20   witness -- summary of my witness interviews, if
21   there are any police reports related to this or
22   any other reports that were given to me, those
23   would have been attached as well.
24       Q.   Are you sure that there was a summary
```

**Page 110**

1  of your findings contained in the final
2  Title IX report?
3      A.   Yes.
4      Q.   What was contained in your summary?
5      A.   I don't recall.
6      Q.   Please tell me everybody that you
7  sent your final Title IX report concerning
8  Marquis Dixon to?
9      A.   It would have been Nancy, Marco, and
10 then president Brophy.
11     Q.   And did you send the final Title IX
12 report to Nancy via email?
13     A.   Yes.
14     Q.   And did you send the final Title IX
15 report to Marco via email?
16     A.   Yes.
17     Q.   And did you send the final Title IX
18 report to the president via email?
19     A.   Yes. And then the two parties
20 involved as well, whoever the complainant was
21 and the respondent.
22     Q.   And the respondent was Marquis Dixon?
23     A.   Yes.
24     Q.   So you would have emailed Marquis

**Page 111**

1  Dixon a copy of your final Title IX report?
2      A.   Yes.
3      Q.   And you would have emailed the
4  complainant a copy of the Title IX report?
5      A.   Yes.
6      Q.   How many complainants were there with
7  respect to this final Title IX report?
8      A.   I believe there was just one. I don't
9  recall there being multiple.
10     Q.   Do you know that there was just one?
11     A.   No.
12     Q.   Okay.
13     A.   I can't recall.
14     Q.   Do you know Dr. Tammy Sarver?
15     A.   Yes.
16     Q.   How do you know her?
17          THE WITNESS: Sorry. Just one second.
18     A.   So she was -- she was on the
19 Title IX -- oftentimes whenever I would do
20 interviews, I would have another faculty member,
21 especially when I did discipline hearings, I
22 would have another faculty member in the room
23 with me so it wasn't just me, and that I would
24 typically pull Tammy Sarver in because she was

**Page 112**

1  head of political science, and she was very well
2  distinguished at the university, very well
3  respected.
4           So I would have her come in to a
5  number of interviews. I don't know if she was
6  in on any of these, I don't recall, but she -- I
7  know she took over for me after I left, so...
8      Q.   Did you have a co-investigator with
9  respect to the Title IX investigation that you
10 did related to Marquis Dixon?
11     A.   I don't recall, but if I did, it would
12 have been her or Betsy, who was head of HR.
13 Those were the two that I used.
14     Q.   If Betsy was your co-investigator,
15 would you have emailed a copy of the final
16 Title IX report to her?
17     A.   Yes.
18     Q.   And can you say her full name again?
19 Betsy, what was it?
20     A.   It was like Betsy Rhineheart (as
21 pronounced), I think. She was the head of HR.
22     Q.   So when --
23     A.   She --
24     Q.   I'm sorry. Go ahead.

**Page 113**

1      A.   She was -- she and I did a lot of the
2  disciplinary hearings for employees, and then I
3  used Tammy for a lot of the disciplinary
4  hearings for students.
5      Q.   Do you know if Betsy Rhineheart is
6  still at Benedictine?
7      A.   I don't know.
8      Q.   And if Tammy Sarver was your
9  co-investigator, would you have sent her a
10 copy of the final Title IX report?
11     A.   I believe so, yes.
12     Q.   And that would have been via email
13 too; right?
14     A.   Yes.
15     Q.   Do you know for sure that you had a
16 co-investigator?
17     A.   I don't.
18     Q.   Okay. Do you recall specifically any
19 Title IX investigations where Dr. Sarver was
20 your co-investigator?
21     A.   I don't remember the specific names,
22 but I remember having interviews with her in the
23 room present and during an interview. I
24 couldn't give you a name though.