Exhibit 5

FATIMAH TOTTEN VS BENEDICTINE UNIVERSITY
TAMMY SARVER                                          2/17/2023

1

1    UNITED STATES DISTRICT COURT FOR THE NORTHERN
2         DISTRICT OF ILLINOIS, EASTERN DIVISION
3
4    FATIMAH TOTTEN,            )
5         Plaintiff,            )
6           -vs-                )  No. 1:20-cv-06107
7    BENEDICTINE UNIVERSITY,    )
8         Defendant.            )
9
10           The discovery deposition of
11   TAMMY SARVER, called by the plaintiff for
12   examination, taken pursuant to the Federal Rules
13   of Civil Procedure of the United States District
14   Courts pertaining to the taking of depositions,
15   taken before CARLA P. LETELLIER, a C.S.R. and
16   Registered Professional Reporter within and for
17   the County of Lake, State of Illinois, taken via
18   Zoom conference, commencing at the hour of
19   approximately 9:00 a.m. on the 17th day of
20   February 2023.
21
22
23
24

**FATIMAH TOTTEN VS BENEDICTINE UNIVERSITY**

TAMMY SARVER  2/17/2023

26 (Pages 98 to 101)

---

Page 98

1 coordinator, remove Mr. Dixon from student
2 housing pending the investigation of
3 Ms. Totten's Title IX complaint?
4    A.  No, that also had to come out of
5 Student Life.
6    Q.  Could you, as Title IX coordinator
7 for Ms. Totten's Title IX complaint, have
8 asked Mr. Dixon to refrain from texting
9 Ms. Totten?
10    A.  No.
11    Q.  All right. So just returning to our
12 Sarver Exhibit 9 here, you go on to write: ▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17        Do you see that?
18    A.  Yes.
19    Q.  Okay. And is the Benedictine
20 University Police Department report you're
21 referring to there the report reflecting
22 Ms. Totten's December 3, 2018, report of being
23 sexually assaulted by Marquis Dixon three
24 times?

Page 99

1    A.  I believe so.
2    Q.  And how were you made aware of that
3 report, specifically?
4    A.  That one? It either came to me
5 through Marco or the police department itself.
6    Q.  Okay. Do you recall specifically
7 whether the police department sent you the
8 report or if Mr. Masini sent you the report?
9    A.  What I think happened was it came from
10 one of them with the other cc'd.
11    Q.  Okay.
12    A.  You know what I mean?
13    Q.  Yeah. So it sounds like, to the best
14 of your recollection, you received it from one
15 of them --
16    A.  Yes, one or both. One or both.
17    Q.  Thank you.
18        The night that Ms. Totten
19 reported to the Benedictine University police
20 that she was sexually assaulted at -- three
21 times, that's when you should have been made
22 aware that there was a complaint of sexual
23 assault; correct?
24        MR. FRAMBES: Objection to form.

Page 100

1 BY THE WITNESS:
2    A.  I mean, I was made aware when I was
3 made aware.
4 BY MS. GALKA:
5    Q.  As Title IX coordinator and under
6 Benedictine's Title IX policy, how quickly
7 should you have been made aware of
8 Ms. Totten's complaint that she had been
9 sexually assaulted to the Benedictine police
10 department?
11    A.  A reasonable amount of time. And
12 that's also operating under the assumption that
13 at that first level of intake she was also
14 provided with the information and the resources.
15    Q.  All right. When you say a reasonable
16 amount of time, what is a reasonable amount of
17 time to you as the Title IX coordinator?
18    A.  Do you mean how -- in my dream how,
19 like, long I'd want something -- how long I'd
20 want somebody to wait to tell me something?
21    Q.  You just testified that the amount of
22 time it should take should be a --
23    A.  Yeah.
24    Q.  (Continuing.) -- reasonable amount of

Page 101

1 time. So I'm just wanting to know, to you as
2 the Title IX coordinator, what is a reasonable
3 amount of time?
4        MR. FRAMBES: Objection. Calls for
5 speculation.
6 BY THE WITNESS:
7    A.  I don't know.
8        All I know, it was our policy and
9 always is our policy that the first level of
10 intake provide the survivor with the resources
11 for survivor -- resources for survivors until
12 that information gets conveyed to me.
13 BY MS. GALKA:
14    Q.  Thank you. Not quite my question.
15        So as the Title IX coordinator at
16 Benedictine University --
17    A.  Hm-hmm.
18    Q.  (Continuing.) -- am I understanding
19 you correctly that you have no idea what a
20 reasonable amount of time is in the context of
21 how long it takes from a student reporting to
22 the police that she had been sexually
23 assaulted to the Title IX coordinator being
24 made aware of it?

**FATIMAH TOTTEN VS BENEDICTINE UNIVERSITY**

TAMMY SARVER                                                                      2/17/2023

38 (Pages 146 to 149)

---

Page 146

1  exactly when you told her that?
2     A.  No.
3     Q.  Okay.
4         MR. FRAMBES:  I'm going to request
5  that we take a break.  Can I get five minutes,
6  Margaret?
7         MS. GALKA:  Sure.  And let's just make
8  it ten.
9         Thanks, Carla.  Ten minutes,
10 please.
11        (Recess taken.)
12        MS. GALKA:  We are back on the record.
13    Q.  Dr. Sarver, what did you do to
14 prepare for your deposition today?
15    A.  Not a lot.  I refreshed my
16 recollection of, you know, some of the emails or
17 some of the notes and -- I mean, not a lot.
18 Can't expect what's coming.
19    Q.  Can you give me a list of documents
20 that you recall reviewing in preparation for
21 your deposition?
22    A.  I looked back at the report, the final
23 report I wrote.  And I looked back at the
24 statements of Fatimah and Dixon.

Page 147

1     Q.  Do you maintain a file or a
2  collection of documents related to
3  Ms. Totten's Title IX investigation?
4     A.  I do.
5         Since I took the role, I have a --
6  like a locked drawer where I keep copies of all
7  the final reports cases that went to final
8  report.  And they're also in a -- like I created
9  an email folder in my own email account called
10 Title IX.
11    Q.  Okay.
12    A.  But I don't know -- yeah, that's my
13 practice.  I don't know what the practice was.
14    Q.  Sure, sure.  Did you review
15 everything in your electronic and drawer file
16 on Ms. Totten prior to this deposition?
17    A.  As much as I could considering my
18 other 900 jobs.
19    Q.  Okay.  And can you tell me, with as
20 much specificity as you can, which emails that
21 you reviewed prior to your deposition today?
22    A.  Yes.
23        I reviewed the one that -- with the
24 standard language that I sent when I originally

Page 148

1  reached out to Fatimah.  I looked back to see if
2  there were email communications with the police,
3  and all that I could come up with with police
4  communications were when I got that ultimate
5  report.  And so that's what I reviewed.
6     Q.  Okay.  The police communications, can
7  you describe those as specifically as
8  possible?
9     A.  Whenever -- I guess December 3rd,
10 whenever -- that one was received -- remember,
11 you asked me if I got it from Marco or if I got
12 it from the police department?  That's when I
13 got information.  And then -- that's what I got
14 from the police, when I got the police reports.
15    Q.  Okay.  Did you speak with anybody to
16 prepare for your deposition today?
17    A.  Yes, I spoke with my attorney.
18    Q.  Okay.  I don't want to know what you
19 spoke about, but I would like to know for how
20 long did you speak to your attorney prior to
21 this deposition?
22    A.  About an hour and a half.
23    Q.  And on what day did you speak with
24 your attorney?

Page 149

1     A.  We met for maybe a half an hour
2  yesterday.  And then about three weeks ago, we
3  met for about an hour.
4     Q.  And then one more question here on
5  kind of the background.
6         Did -- have you in the past --
7  let me strike that.
8         Since 2020, have you been asked
9  to search your cell phone for text messages
10 related to Ms. Totten's Title IX complaint?
11    A.  Have I been asked, no.
12    Q.  Did you search for text messages
13 related to Fatimah's Title IX complaint prior
14 to your deposition?
15    A.  Personally?  I don't think so.  I'm
16 not a big texter with students.  I don't find
17 that an appropriate means of communication,
18 so -- I mean, I have my phone here.  There are
19 no text messages.
20    Q.  Okay.  So fair to say you never
21 turned over any texts to your attorney; is
22 that right?
23    A.  Yes, that's right.  I never turned
24 over texts.